ORIGINAL

U.S. DISTRICT COURT
FILED
JUN 0 1 2015
S.D. of N.Y.

APPROVED: _____
CHRISTIAN R. EVERDELL
Assistant United States Attorney

BEFORE:   THE HONORABLE HENRY B. PITMAN
          United States Magistrate Judge
          Southern District of New York

**15 MAG   1851**

**DOC # 1**

- - - - - - - - - - - - - - x

UNITED STATES OF AMERICA        :

        -v.-                    :

CARLTON P. CABOT,              :
TIMOTHY J. KROLL,
                               :

                Defendants.    :

- - - - - - - - - - - - - - x

SEALED COMPLAINT

Violations of
15 U.S.C. §§ 78j(b), 78ff;
17 C.F.R. § 240.10b-5;
18 U.S.C. §§ 371, 1343, 1349,
1956, 1957, and 2

COUNTY OF OFFENSES:
NEW YORK

SOUTHERN DISTRICT OF NEW YORK, ss.:

        VIRGINIA COLOMBO, being duly sworn, deposes and says
that she is a Postal Inspector with the United States Postal
Inspection Service ("USPIS"), and charges as follows:

### COUNT ONE

#### (Conspiracy to Commit Securities Fraud)

        1.    From at least in or about 2008, through at least
in or about 2012, in the Southern District of New York and
elsewhere, CARLTON P. CABOT and TIMOTHY J. KROLL, the
defendants, and others known and unknown, willfully and
knowingly, did combine, conspire, confederate and agree together
and with each other to commit an offense against the United
States, to wit, securities fraud, in violation of Title 15,
United States Code, Sections 78j(b) and 78ff and Title 17, Code
of Federal Regulations, Section 240.10b-5.

        2.    It was a part and an object of the conspiracy
that CARLTON P. CABOT and TIMOTHY J. KROLL, the defendants, and
others known and unknown, willfully and knowingly, directly and
indirectly, by use of the means and instrumentalities of

1

interstate commerce, and of the mails, would and did use and
employ manipulative and deceptive devices and contrivances in
connection with the purchase and sale of securities, in
violation of Title 17, Code of Federal Regulations, Section
240.10b-5, by: (a) employing devices, schemes, and artifices to
defraud; (b) making untrue statements of material facts and
omitting to state material facts necessary in order to make the
statements made, in light of the circumstances under which they
were made, not misleading; and (c) engaging in acts, practices,
and courses of business which operated and would operate as a
fraud and deceit upon other persons, in violation of Title 15,
United States Code, Sections 78j(b) and 78ff.

<u>Overt Acts</u>

3.    In furtherance of the conspiracy and to effect
its illegal object, CARLTON P. CABOT and TIMOTHY J. KROLL, the
defendants, and others known and unknown, committed the
following overt acts, among others, in the Southern District of
New York and elsewhere:

a.    Between in or about January 2011, and in or
about March 2012, approximately $41,867 of funds belonging to
various tenants-in-common ("TIC") investments sponsored by Cabot
Investment Properties ("CIP") (collectively, the "TIC
Investments") was transferred from a CIP bank account controlled
by CABOT and KROLL ("CIP Operating Account 1") to a private
college located in Connecticut to pay for the college tuition of
one of CABOT's children.

b.    From in or about March 2010, through in or
about January 2011, approximately $50,035 of funds belonging to
the TIC Investments was transferred from CIP Operating Account 1
to pay for KROLL's rental apartment at a luxury apartment
building in Manhattan, New York.

c.    On or about February 11, 2011, approximately
$75,000 was transferred out of a bank account belonging to a
CIP-sponsored TIC investment into a CIP bank account controlled
by CABOT and KROLL ("CIP Operating Account 2").  On the same
day, approximately $75,000 was transferred out of CIP Operating
Account 2 into a bank account belonging to a different CIP-
sponsored TIC investment, in contravention of written and oral
representations about how the revenue from the TIC Investments

would be distributed and without the knowledge or consent of the investors (the "TIC Investors").

    d. In or about 2010, KROLL created a balance sheet for a particular CIP-sponsored TIC Investment to be included in a quarterly investor report for the period ending March 31, 2010, which KROLL had manipulated to fraudulently eliminate a debt owed by CIP to the TIC investment.

    e. In or about 2011, KROLL created a balance sheet for a particular CIP-sponsored TIC Investment to be included in a quarterly investor report for the period ending March 31, 2011, which KROLL had manipulated to fraudulently eliminate a debt owed by CIP to the TIC investment.

    f. In or about 2011, KROLL falsely told a TIC Investor that the funds belonging to the particular TIC Investment had not been comingled with funds from other TIC Investments.

    (Title 18, United States Code, Section 371.)

## COUNT TWO

### (Conspiracy to Commit Wire Fraud)

    4. From at least in or about 2008, through at least in or about 2012, in the Southern District of New York and elsewhere, CARLTON P. CABOT and TIMOTHY J. KROLL, the defendants, and others known and unknown, willfully and knowingly, did combine, conspire, confederate and agree together and with each other to commit an offense against the United States, to wit, wire fraud, in violation of Title 18, United States Code, Section 1343.

    5. It was a part and an object of the conspiracy that CARLTON P. CABOT and TIMOTHY J. KROLL, the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, would and did transmit and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for

the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

### Overt Acts

6.   In furtherance of the conspiracy and to effect its illegal object, CARLTON P. CABOT and TIMOTHY J. KROLL, the defendants, committed the overt acts set forth in Paragraph 3 of this Complaint, among others, which are fully incorporated by reference herein, in the Southern District of New York and elsewhere.

(Title 18, United States Code, Section 1349.)

### COUNT THREE

### (Conspiracy to Commit Money Laundering)

7.   From at least in or about 2008, through at least in or about 2012, in the Southern District of New York and elsewhere, CARLTON P. CABOT and TIMOTHY J. KROLL, the defendants, and others known and unknown, willfully and knowingly, did combine, conspire, confederate and agree together and with each other to commit offenses against the United States, to wit, money laundering, in violation of Title 18, United States Code, Sections 1956(a)(1)(A)(i) and 1957.

8.   It was a part and an object of the conspiracy that CARLTON P. CABOT and TIMOTHY J. KROLL, the defendants, and others known and unknown, in an offense involving and affecting interstate and foreign commerce, knowing that the property involved in certain financial transactions represented the proceeds of some form of unlawful activity, willfully and knowingly would and did conduct and cause to be conducted such financial transactions which in fact involved the proceeds of specified unlawful activity, with the intent to promote the carrying on of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i).

9.   It was further a part and an object of the conspiracy that CARLTON P. CABOT and TIMOTHY J. KROLL, the defendants, and others known and unknown, in an offense involving and affecting interstate and foreign commerce, willfully and knowingly would and did engage in and cause others

4

to engage in a monetary transaction, as that term is defined in
Title 18, United States Code, Section 1957(f)(1), in criminally
derived property that was of a value greater than $10,000, in
violation of Title 18, United States Code, Section 1957.

### Overt Acts

10.   In furtherance of the conspiracy and to effect
its illegal objects, CARLTON P. CABOT and TIMOTHY J. KROLL, the
defendants, committed the overt acts set forth in Paragraph 3 of
this Complaint, among others, which are fully incorporated by
reference herein, in the Southern District of New York and
elsewhere.

(Title 18, United States Code, Section 1956(h).)

### COUNT FOUR

### (Securities Fraud)

11.   From at least in or about 2010, through at least
in or about 2012, in the Southern District of New York and
elsewhere, CARLTON P. CABOT and TIMOTHY J. KROLL, the
defendants, willfully and knowingly, directly and indirectly, by
use of the means and instrumentalities of interstate commerce,
and of the mails, would and did use and employ manipulative and
deceptive devices and contrivances in connection with the
purchase and sale of securities, in violation of Title 17, Code
of Federal Regulations, Section 240.10b-5, by: (a) employing
devices, schemes, and artifices to defraud; (b) making untrue
statements of material facts and omitting to state material
facts necessary in order to make the statements made, in light
of the circumstances under which they were made, not misleading;
and (c) engaging in acts, practices, and courses of business
which operated and would operate as a fraud and deceit upon
other persons, to wit, CABOT and KROLL provided false and
misleading financial reports and made other false and misleading
statements to the TIC Investors in order to conceal their
misappropriation of funds from the TIC Investments.

(Title 15, United States Code, Sections 78j(b) and 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5; and
Title 18, United States Code, Section 2.)

5

## COUNT FIVE

### (Wire Fraud)

12.   From at least in or about 2010, through at least in or about 2012, in the Southern District of New York and elsewhere, CARLTON P. CABOT and TIMOTHY J. KROLL, the defendants, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, would and did transmit and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, CABOT and KROLL engaged in a scheme to defraud the TIC Investors by providing false and misleading financial reports and other false and misleading information to the TIC Investors in order to conceal their misappropriation of funds from the TIC Investments, and in connection therewith and in furtherance thereof, CABOT and KROLL sent emails, engaged in telephone calls, and caused wire transfers of funds to be sent in interstate commerce.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT SIX

### (Money Laundering)

13.   From at least in or about 2010, through at least in or about 2012, in the Southern District of New York and elsewhere, CARLTON P. CABOT and TIMOTHY J. KROLL, the defendants, in an offense involving and affecting interstate and foreign commerce, knowing that the property involved in certain financial transactions represented the proceeds of some form of unlawful activity, willfully and knowingly would and did conduct and cause to be conducted such financial transactions which in fact involved the proceeds of specified unlawful activity, with the intent to promote the carrying on of specified unlawful activity, to wit, CABOT and KROLL facilitated the fraud scheme charged in Counts One, Two, Four, and Five by transferring funds into and out of bank accounts belonging to the TIC Investments, via CIP Operating Account 1 and CIP Operating Account 2 (collectively, "the CIP Operating Accounts"), in order to keep

failing TIC Investments financially solvent.

(Title 18, United States Code, Sections 1956(a)(1)(A)(i) and 2.)

## COUNT SEVEN

### (Illegal Monetary Transactions)

14.   From at least in or about 2010, through at least in or about 2012, in the Southern District of New York and elsewhere, CARLTON P. CABOT and TIMOTHY J. KROLL, the defendants, in an offense involving and affecting interstate and foreign commerce, willfully and knowingly would and did engage in and cause others to engage in a monetary transaction, as that term is defined in Title 18, United States Code, Section 1957(f)(1), in criminally derived property that was of a value greater than $10,000, to wit, CABOT and KROLL, among other things, caused wire transfers of over $10,000 each to be sent from the CIP Operating Accounts to pay for personal and business expenses, knowing that the funds transferred represented the proceeds of the fraud scheme charged in Counts One, Two, Four, and Five against the TIC Investors.

(Title 18, United States Code, Sections 1957 and 2.)

The bases for my knowledge and the foregoing charges are, in part, as follows:

15.   I am a Postal Inspector with the USPIS, and have been in that position for over two years.  Before that, I was an intelligence analyst for the Nassau County Police Department for over two years.  I have personally participated in the investigation of this matter along with Special Agents from the Internal Revenue Service ("IRS") and other Criminal Investigators from the United States Attorney's Office for the Southern District of New York ("USAO-SDNY") (collectively, the "Investigative Team").  While with the USPIS, I have participated in numerous investigations of fraud and money laundering offenses, among other crimes.

16.   I am familiar with the facts and circumstances set forth below from my participation in the investigation of this matter, from my personal knowledge, and from my conversations with members of the Investigative Team and others, and have examined documents and other records.  Where the

7

contents of documents and the actions, statements and
conversations of others are reported herein, they are reported
in sum and substance, except where otherwise indicated.
Moreover, because this affidavit is submitted for the limited
purpose of establishing probable cause supporting the arrests of
the defendants, I have not set forth each and every fact learned
during the course of this investigation.

<u>BACKGROUND</u>

*The Relevant Parties*

17.   From my discussions with former employees of CIP
and its affiliated companies, and other individuals who had
business dealings with CIP and its executives and employees, and
my review of documents and materials gathered during the course
of this investigation, I have learned, in substance and in part,
the following:

a.   CIP is a privately-held real estate
investment management company that was incorporated in
Massachusetts in or about 1998.  During the relevant time
period, CIP maintained an office at different locations in
Manhattan, New York, which served as its primary place of
business.  CIP specialized in commercial real estate
investments, including so-called TIC securities offerings
(described further below).  From in or about 2003 through in or
about 2012, CIP sponsored and oversaw approximately 18 separate
TIC securities offerings to investors located all over the
United States, and helped manage these investments.  During the
relevant time period, CIP was wholly-owned and controlled by
CARLTON P. CABOT and TIMOTHY J. KROLL, the defendants.

b.   CABOT was the founder, President and Chief
Executive Officer of CIP.  Among other things, CABOT helped
create the TIC Investments and was primarily responsible for
finding investors and overseeing the management of the TIC
Investments in general.  CABOT was also one of only three people
who had the authority to approve wire transfers from bank
accounts belonging to the TIC Investments (the "TIC Bank
Accounts") to the CIP Operating Accounts, and vice versa.
During the relevant time period, CABOT held at least a 51%
ownership interest of CIP and its subsidiaries and affiliated
entities.

8

c.   KROLL was the Chief Operating Officer of
CIP.  Among other things, KROLL helped create the TIC
Investments and was primarily responsible for managing the
finances of the TIC Investments and reporting the quarterly
financial results to the TIC Investors.  KROLL was also one of
only three people who had the authority to approve wire
transfers from the TIC Bank Accounts to the CIP Operating
Accounts, and vice versa.  From in or about 2009 through in our
about 2012, KROLL held a 49% ownership interest of CIP and its
subsidiaries and affiliated entities.

### CIP's Tenants-in Common ("TIC") Investments

18.  From my review of publicly available documents
and other documents gathered during the course of this
investigation, I have learned the following:

a.   A TIC investment is a real estate investment
in commercial real estate projects, such as apartment houses,
shopping centers, office buildings, etc.  By owning an interest
in the TIC investment, TIC investors are entitled to receive a
portion of the rental income generated from the business tenants
after the mortgage payments and operating expenses for the
property have been paid.

b.   TIC investments typically are usually
structured and sold as securities.  The entity offering the TIC
investment, called the "sponsor," identifies a particular parcel
of commercial real estate that will form the basis for the TIC
investment.  The sponsor then solicits investments from TIC
investors.  The sponsor finances the purchase of the real estate
through the capital raised from the TIC investors and debt
issued from mortgage banks.

c.   TIC investments offer several potential
benefits.  First, if the properties are successful and generate
a steady stream of rental income, the TIC investors will receive
regular disbursements from the operating profits of the property
without having to assume the responsibilities of managing the
property itself.  Second, TIC investments offer certain tax
advantages for TIC investors who recently sold a piece of real
estate.  Under Section 1031 of the Internal Revenue Code, TIC
investors may be able to defer paying taxes on the capital gains
from the previous real estate sale if they invest the proceeds

from that sale in a TIC investment.

       19.    From my review of publicly available documents and Private Placement Memoranda ("PPMs") for the TIC investments sponsored by CIP, as well as other documents gathered during the course of this investigation, I have learned, in substance and in part, the following:

       a.    From in or about 2003 through in or about 2007, CIP sponsored the following 18 TIC investments (the "TIC Investments"), which were based on commercial properties located in Florida, Ohio, Wisconsin, Indiana, Connecticut, Kentucky, Georgia, and North Carolina.

- Cabot 20 North Orange
- Cabot 465 Cleveland Avenue
- Cabot 550 Polaris Parkway
- Cabot 570 Polaris Parkway
- Cabot Addison
- Cabot Ashtabula
- Cabot BB&T Financial Center
- Cabot Creekside Mall
- Cabot Cypress Creek Tower
- Cabot Dadeland Towers North
- Cabot East Broward
- Cabot East Town
- Cabot Golf
- Cabot Northpark/Southland
- Cabot North University Drive
- Cabot Oak Grove Plaza
- Cabot Trafalgar/Avion
- Cabot Turfway Ridge

       b.    CIP structured and marketed the TIC Investments as securities. For each of the TIC Investments, CIP solicited investors by issuing a Private Placement Memorandum ("PPM") describing the particular TIC Investment. The PPMs were, in turn, disseminated and marketed to the investors by broker-dealers.

       c.    For each of the TIC Investments, CIP formed a wholly-owned subsidiary that purchased the subject property

and offered tenant-in-common interests in the property to the TIC Investors (the "Acquisition Subsidiary").  For example, the Acquisition Subsidiary for Cabot East Town was called "Cabot East Town Acquisition LLC."  The TIC Investors purchased their shares in the particular TIC Investment from the Acquisition Subsidiary for that TIC Investment.

        d.    For each of the TIC Investments, CIP formed another wholly-owned subsidiary that was responsible for operating the property (the "Master Lessee Subsidiary").  For example, the Master Lessee Subsidiary for Cabot East Town was called "Cabot East Town LeaseCo LLC."  After the TIC Investors purchased their shares in the TIC Investment from the Acquisition Subsidiary, the TIC Investors then leased the property to the Master Lessee Subsidiary pursuant to a Master Lease Agreement, which outlined the various duties and responsibilities of the Master Lessee Subsidiary.[1]

        e.    Under the terms of the Master Lease Agreement, as summarized in the PPMs, the Master Lessee Subsidiary was responsible for paying the costs of managing and maintaining the property and making the mortgage payments on the property.  The Master Lessee Subsidiary was also responsible for paying regular disbursements to the TIC Investors from the operating profits of the property.  According to the PPMs, CIP estimated that the annual payment to the TIC Investors would total approximately 8.5% of their equity investment in the first three years of the investment and would increase steadily thereafter up to approximately 12%.

        f.    According to the PPMs, the Master Lessee Subsidiary was entitled to retain any excess profits from the property's rental income, but only after it had paid the operating expenses of the property and the disbursements due to the TIC Investors.  By the same token, the Master Lessee

---

[1] Some of the TIC Investments used different terms for these entities and agreements.  For example, for Cabot 465 Cleveland Avenue, the CIP subsidiary that was responsible for operating the property was called "Cabot 465 Cleveland Avenue Asset Manager LLC," and the agreement between the TIC Investors and the CIP subsidiary was called an "Asset Management Agreement," as opposed to a Master Lease Agreement.

Subsidiary was responsible for any cash shortfalls if it could not cover the operating expenses and disbursements to the TIC Investors.

g.      According to the PPMs, the Master Lessee Subsidiary was also entitled to receive a fee for managing the day-to-day operations of the TIC Investment properties.   With the exception of Cabot Addison, which a CIP affiliate managed directly, CIP sub-contracted these responsibilities to independent property management companies (the "Property Managers"), pursuant to Property Management Agreements.   Under the terms of the Property Management Agreements, the Property Managers were responsible for, among other things, collecting rent from tenants, paying bills, maintaining accurate financial books and records, and providing monthly financial statements to CIP.   For performing these services, a Property Manager typically received fees of up to 4% of the gross revenue of the particular property.  CIP sometimes retained a small asset management fee to assist the Property Managers with their responsibilities.

h.      According to the PPMs, the Acquisition Subsidiary was entitled to receive certain one-time fees related to acquiring the property and offering the TIC investment. These fees included an "Acquisition Fee" of approximately 9% of the gross proceeds of the offering for negotiating the purchase of the property from the seller.

i.      From in or about 2003 through in or about 2007, CIP raised a total of approximately $240 million in capital from the TIC Investors to fund the 18 TIC Investments. Many of the TIC Investors were elderly retirees who invested a large portion of their overall net worth in the TIC Investments and who planned to rely on the disbursements from the TIC Investments as a significant source of income for retirement.

## OVERVIEW OF THE SCHEME

20.   The collapse of the commercial real estate market that began in or about 2007, and the economic recession that followed, had a sharply negative effect on the profitability of commercial real estate investments, including the TIC Investments sponsored by CIP.  Beginning in or about 2008, many of the TIC Investment properties were not generating enough

12

rental income to cover their operating expenses or the disbursements to the TIC Investors.  As a result, CIP's own expected income from the TIC Investments was sharply reduced because there were no excess profits for CIP to collect from the existing TIC Investments and no opportunities for additional property acquisitions.  Because these excess profits and property acquisition fees represented CIP's principal sources of income, CIP began losing money precipitously.  For example, in 2008, CIP lost approximately $7.7 million, and in 2009, CIP lost approximately $7.2 million.

21.   As a result, as described in more detail below, from in or about 2008 through in or about 2012, CARLTON P. CABOT and TIMOTHY J. KROLL, the defendants, engaged in a scheme to defraud the TIC Investors by misappropriating funds belonging to the TIC Investments to pay for personal and business expenses, and to keep failing TIC Investments financially solvent, and then concealing their misappropriations by providing false and misleading financial reports and other information to the TIC Investors.

22.   According to the representations in the PPMs, CIP was only allowed to collect "excess" rental income from the TIC Investments – i.e., any additional money left over after the TIC Investments had paid the operating expenses for the properties and the disbursements due to the TIC Investors.  Despite these representations, CARLTON P. CABOT and TIMOTHY J. KROLL, the defendants, repeatedly transferred money out of the TIC Bank Accounts and into the CIP Operating Accounts, before the TIC Investments could use the funds to pay for operating expenses and disbursements to the TIC Investors.  CABOT and KROLL then used these funds to pay for the following three unauthorized purposes, without the knowledge or authorization of the TIC Investors:

a.   First, CABOT and KROLL caused millions of dollars to be transferred from the CIP Operating Accounts to the bank accounts of TIC Investments that had no available funds to cover their operating expenses and investor distributions.  In this way, CABOT and KROLL were able to perpetuate the fraud scheme by propping up failing TIC Investments using funds belonging to other TIC Investments.

13

b.      Second, CABOT and KROLL used the funds in the CIP Operating Accounts belonging to the TIC Investments to pay for millions of dollars of personal expenses, including expensive cars and rental apartments and private school tuitions.

c.      Third, CABOT and KROLL used the funds in the CIP Operating Accounts belonging to the TIC Investments to pay for CIP business expenses, including an approximately $1,125,651 civil settlement to certain TIC Investors who had sued CABOT, KROLL, CIP, and a CIP subsidiary.

23.  To conceal their misappropriation of TIC Investment funds from the TIC Investors, CARLTON P. CABOT and TIMOTHY J. KROLL, the defendants, provided false and misleading financial reports to the TIC Investors which intentionally hid the fact that CIP owed large sums of money to the TIC Investments.

24.  CARLTON P. CABOT and TIMOTHY J. KROLL, the defendants, also gave false and misleading information to the TIC Investors about how the TIC Investment funds were managed in order to prevent the TIC Investors from learning the true financial status of their investment.  For example, on one occasion in or about 2011, in response to a question from a TIC Investor, KROLL falsely told the TIC Investor that the funds belonging to the particular TIC Investment had not been comingled with funds from other TIC Investments.

25.  In or about the end of 2012, CIP disbanded and effectively went out of business.  By that point, CIP and its principals - CARLTON CABOT and TIMOTHY KROLL, the defendants - owed approximately $17 million to the TIC Investments, which has never been repaid.

### FRAUDULENT MISAPPROPRIATION OF FUNDS

#### *The Money Flow*

26.  During the course of the investigation, I have participated in interviews of several former CIP employees who had accounting and financial reporting responsibilities, and who were familiar with the transfers of TIC Investment funds into and out of the CIP Operating Accounts.

27.   Based on the interviews of one CIP employee ("CIP
Employee 1"), who worked for CIP from in or about 2006 through
in or about 2010, I have learned, in substance and in part, the
following:

a.   Each of the 18 TIC Investments maintained a
bank account that contained the operating revenue for the
particular TIC Investment.  As a general rule, the operating
revenue was deposited in a "lockbox" account from which the
mortgage payments were automatically deducted.   The remaining
funds were supposed to be used to pay investor distributions and
operating expenses for the property.  As stated above, only
after these payments had been deducted, could any excess profit
left in the account be transferred to the CIP Operating
Accounts.  Only CARLTON P. CABOT and TIMOTHY J. KROLL, the
defendants, and a third individual who did accounting work for
CIP (the "Accountant") had the authority to make wire transfers
into and out of the CIP Operating Accounts.

b.   Beginning in or about 2008, many of the TIC
Investments started experiencing financial trouble and could not
cover operating expenses or investor distributions.  During that
same time period, CABOT and KROLL changed the existing policy
that gave the individual Property Managers discretion to decide
which bills to pay and when to pay them.  Following the change,
CABOT or KROLL had to approve all vendor payments for the TIC
Investment properties before they could be paid out.

c.   During that same time period, CIP Employee 1
observed money being transferred out of the TIC Bank Accounts
and into CIP Operating Account 1 approximately every month.
KROLL would frequently ask CIP Employee 1 how much money was in
the various TIC Bank Accounts.  Once CIP Employee 1 had
identified a TIC Bank Account with available funds and provided
the amount to KROLL, that approximate amount would be withdrawn
from the TIC Bank Account and deposited into CIP Operating
Account 1 shortly thereafter.

d.   These withdrawals caused problems for the
Property Managers.  On several occasions, individual Property
Managers called CIP Employee 1 to complain that they had no
funds available to cover the operating expenses of the property
and to inquire about where the money in the accounts had gone.

15

        e.   On several occasions from in or about 2008 through in or about November 2010, when CIP Employee 1 left CIP, KROLL directed CIP Employee 1 to transfer funds from CIP Operating Account 1 to personal bank accounts belonging to CABOT and KROLL.  For some of the transfers to CABOT's account, KROLL indicated to CIP Employee 1 that CABOT had requested the transfers.  CIP Employee 1 also overheard numerous phone calls between KROLL and CABOT, after which KROLL would transfer money from CIP Operating Account 1 to pay for CABOT's personal expenses.  According to CIP Employee 1, these phone calls happened frequently during the last few weeks of 2010, and usually occurred between the 10th and the 15th of the month, when the TIC Bank Accounts had cash available after the property tenants had paid their rents. CIP Employee 1 recalled a specific phone call during which KROLL informed CABOT, in sum and substance, that he (KROLL) could not complete the funds transfer because the money from the TIC properties had not come in yet to the CIP Operating Accounts.

        f.   Around this same time period, on several occasions, CIP Employee 1 observed KROLL reallocate funds from individual TIC property accounts to other TIC properties that were struggling to meet expenses.  The reallocations occurred before the property with available funds could pay its own operating expenses and investor disbursements.

        g.   CIP Employee 1 confronted KROLL about these transfers on more than one occasion.  When CIP Employee 1 asked KROLL why he was taking money from the TIC Investments, KROLL responded, in substance and in part, that he needed the money to cover payroll for the CIP employees, as well as the operating expenses and investor distributions for other TIC Investments.

        h.   CIP Employee 1 resigned from CIP in or about November 2010, because, among other reasons, CIP Employee 1 was uncomfortable with how CABOT and KROLL were managing the TIC Investments.  When CIP Employee 1 resigned, CIP Employee 1 had a conversation with KROLL in KROLL's office.  During that conversation, KROLL told CIP Employee 1, in sum and substance, "I can't believe I got myself into this situation."  CIP Employee 1 understood KROLL to mean that KROLL had gotten himself into a bad situation by misappropriating money from the TIC Investments.

28.   I also participated in the interview of another former CIP employee ("CIP Employee 2"), who corroborated certain information provided by CIP Employee 1.  For example, based on the interview of CIP Employee 2, who worked at CIP from in or about 2007 through in or about 2012, I have learned, in substance and in part, the following:

a.   CABOT, KROLL, and the Accountant were the only people who had the authority to approve wire transfers into and out of the CIP Operating Accounts.  Most of the wire transfers were approved by KROLL.

b.   KROLL would instruct CIP Employee 2 on which bills needed to be paid and when.  On several occasions, KROLL also instructed CIP Employee 2 to pay certain TIC Investors who called to complain about not receiving their disbursements.

c.   On several occasions, KROLL instructed CIP Employee 2 to withdraw funds from particular TIC Bank Accounts and deposit them in the accounts of other TIC properties.

d.   On several occasions, CABOT and KROLL received money from CIP Operating Account 1 to pay for personal living expenses.  The expenses were either paid directly out of CIP Operating Account 1 or the funds were transferred to the personal accounts of CABOT and KROLL.  CABOT and KROLL received these funds at a time when the TIC Investments were losing money and could not cover their operating expenses and investor disbursements.

29.   During the course of the investigation, I have also participated in interviews of Property Managers who oversaw the day-to-day operation of ten of the TIC Investment properties, and who maintained general ledgers for the TIC properties and kept track of, among other things, withdrawals and deposits to and from the TIC Bank Accounts.

30.   Based on the interviews of one of the Property Managers who managed three of the TIC Investment properties ("Property Manager 1"), and my review of general ledgers and other financial and accounting documents provided by Property Manager 1, I have learned, in substance and in part, the following:

17

.

a.    Beginning in or about 2008, CABOT and KROLL withdrew funds on multiple occasions from the accounts of the TIC properties that Property Manager 1 managed for CIP.

b.    On more than one occasion, Property Manager 1 sent CABOT and KROLL an email detailing the amount of money that had been deposited in the property account and the specific bills that Property Manager 1 intended to pay.  After sending the emails, the money was withdrawn from the property account shortly thereafter.

c.    In one specific example, on or about April 18, 2012, an associate of Property Manager 1 informed KROLL that one of the TIC property accounts had approximately $27,000 in available funds.  KROLL gave permission to use the funds to pay bills for the property.  A few hours later, however, approximately $27,000 was withdrawn from the property account.

d.    Property Manager 1 kept track of these withdrawals by assigning them to a third party receivable account on the general ledgers that Property Manager 1 maintained.  Occasionally, CABOT and KROLL reimbursed some of the withdrawn money, but the balances kept growing.  Property Manager 1 estimated that by in or about October 2012, CABOT and KROLL owed a total of approximately $290,252 to Cabot 465 Cleveland Avenue, $226,784 to Cabot 570 Polaris Parkway, and $624,765 to Cabot 550 Polaris Parkway.

e.    Property Manager 1 recalled receiving an email from CIP in or about November 2009 attaching what appeared to be a schedule of withdrawals and deposits.  Under the heading "Funds Into CIP," the schedule showed approximately $115,000 coming from the three TIC Investments that Property Manager 1 managed.  Under the heading "Funds Out of CIP," the schedule showed approximately $115,000 going to three unrelated TIC Investments.  Property Manager 1 was told to delete the email shortly after receiving it.  It was at that point that Property Manager 1 realized that CABOT and KROLL were taking money from the TIC properties that Property Manager 1 managed and sending it to other TIC properties.

f.    Property Manager 1 contacted the Property Manager for Cabot BB&T Financial Center – one of the other TIC properties that, according to the schedule, had received some of

18

the funds.  The Property Manager for Cabot BB&T Financial Center
indicated that he, too, was having trouble paying the operating
expenses of the property he managed, despite the property being
fully leased.

31.  I also participated in the interview of another
Property Manager who managed several CIP Investment properties
("Property Manager 2").  Property Manager 2 corroborated the
pattern of withdrawals from the TIC property accounts to the CIP
Operating Accounts that Property Manager 1 described.
Furthermore, based on the interview of Property Manager 2, and
my review of general ledgers and other financial and accounting
documents provided by Property Manager 2, I have learned, in
substance and in part, that by in or about 2012, CARLTON P.
CABOT and TIMOTHY J. KROLL, the defendants, owed a total of
approximately $2,504,006 to Cabot 20 North Orange, $2,042,807 to
Cabot East Broward, $777,811 to Cabot Oak Grove Plaza, and
$1,015,818 to Cabot Trafalgar/Avion.

### The Bank Records

32.  During the course of the investigation, I have
reviewed bank records from the CIP Operating Accounts and the
TIC Bank Accounts, as well as the general ledgers and other
financial and accounting documents maintained by the Property
Managers.  These records corroborate the flow of money described
above by the CIP Employees and the Property Managers and provide
specific examples of the three types of unauthorized wire
transfers of funds belonging to the TIC Investments.  For
example:

*Transfers to Cover Expenses of Struggling TIC Investments*

a.  On or about October 28, 2010, approximately
$31,500 was transferred out of the Cabot Oak Grove Plaza
property account into CIP Operating Account 2.  On the same day,
approximately $31,500 was transferred out of CIP Operating
Account 2 into the Cabot Addison property account.

b.  On or about February 11, 2011, approximately
$75,000 was transferred out of the Cabot Ashtabula property
account into CIP Operating Account 2.  On the same day,
approximately $75,000 was transferred out of CIP Operating
Account 2 into the Cabot Oak Grove Plaza property account.

*Transfers to Cover Personal Expenses of CABOT and KROLL*

    c. From in or about 2009, through in or about 2013, CARLTON P. CABOT and TIMOTHY J. KROLL, the defendants, caused funds belonging to the TIC Investments to be transferred from the CIP Operating Accounts to pay for millions of dollars of personal expenses.  For example:

    i. Between on or about April 1, 2010, and on or about April 30, 2010, approximately $27,500 was transferred from the CIP Operating Accounts to one of CABOT's personal bank accounts.  During that same month, a check totaling approximately $9,500 was drawn on CABOT's personal account to pay for an apartment rental in Miami, Florida.  In addition, throughout that same month, a total of approximately $18,085 was withdrawn from CABOT's personal account to pay for daily living expenses.

    ii. Between in or about January 2011, and in or about March 2012, approximately $41,867 was transferred from CIP Operating Account 1 to a private college located in Connecticut to pay for the college tuition of one of CABOT's children.

    iii. On or about August 28, 2012, a wire transfer of approximately $12,790 was sent from CIP Operating Account 1 to a private university located in Pennsylvania to pay for the college tuition of one of CABOT's children.

    iv. From in or about March 2010, through in or about January 2011, approximately $50,035 was transferred from CIP Operating Account 1 to pay for KROLL's rental apartment at a luxury apartment building located in Manhattan, New York.

    v. On or about March 31, 2010, approximately $40,000 was transferred from CIP Operating Account 2 to KROLL's personal bank account.  On or about April 2, 2010, KROLL made a mortgage payment of approximately $8,715 from his personal bank account.  On or about April 5, 2010, KROLL made a payment of approximately $30,000 to American Express from his personal bank account.

    vi. On or about January 21, 2012, KROLL

20

purchased a 2012 BMW 650XI, with a manufacturer's suggested
retail price of approximately $105,476. Between on or about
January 21, 2012, and on or about August 20, 2012, approximately
$22,500 was debited from KROLL's personal bank account to BMW
Financial Services and BMW Sales.

*Transfers to Cover CIP Business Expenses*

        d.    I know from publicly filed documents and my
discussions with a former attorney at a law firm based in
Arizona (the "Law Firm") that the Law Firm brought a law suit
against CABOT, KROLL, CIP, and a CIP subsidiary on behalf of the
Cabot Creekside TIC Investors, and negotiated a settlement for
damages. The financial records reflect that the settlement was
paid out of the CIP Operating Accounts using funds withdrawn
from the TIC Bank Accounts. For example:

        i.    On or about July 15, 2011, multiple
wire transfers totaling approximately $230,000 were sent to CIP
Operating Account 2 from the bank accounts of the following TIC
Investments: Cabot 465 Cleveland Avenue, Cabot East Town, Cabot
North University Drive, Cabot Trafalgar/Avion, and Cabot Turfway
Ridge. On the same day, a payment of approximately $216,500 was
made from CIP Operating Account 2 to the Law Firm.

        ii.    On or about October 14, 2011, multiple
wire transfers totaling approximately $247,000 were sent to CIP
Operating Account 2 from the bank accounts of the following TIC
Investments: Cabot Ashtabula, Cabot BB&T Financial Center, Cabot
Cypress Creek Tower, Cabot East Town, Cabot 20 North Orange,
Cabot Trafalgar/Avion, and Cabot Turfway Ridge. On the same
day, a payment of approximately $216,500 was made to the Law
Firm.

### The Short Sale Letter

        33.    Based on my review of the general ledgers, tax
returns, and other financial and accounting documents maintained
by CIP, I know that the misappropriation of funds described
above occurred at a time when CIP was suffering huge losses.

        34.    For example, I have reviewed a letter written by
the Accountant, on behalf of CARLTON P. CABOT, the defendant, to
the bank that held the mortgage on CABOT's primary residence in
Massachusetts. In the letter, which is dated January 28, 2010,

21

CABOT asked the bank to approve a short sale of his residence as
quickly as possible because he had experienced "significant
business reversals which have had a profound impact on all
aspects of [his] life."  CABOT then described the different
income sources for CIP – including "acquisition fees from new
transactions," "property management fees," and "Master Lease
Revenue" – and stated, in sum and substance, that none of these
income sources had generated revenue for CIP since in or about
early 2008.  CABOT further stated that CIP lost approximately
$7.7 million in 2008 and approximately $4.5 million in 2009.

### CONCEALMENT OF MISAPPROPRIATION FROM TIC INVESTORS

#### *Misleading Financial Reports*

35.  Based on my discussions with the Property
Managers and CIP Employee 1, I have learned that it was the
responsibility of the Property Mangers to provide CIP with
detailed financial reports concerning the TIC Investment
properties on a monthly basis.  These reports included, among
other things, balance sheets, trial balances, income statements,
budgets, general ledgers, bank reconciliations and bank
statements.

36.  According to CIP Employee 1, TIMOTHY J. KROLL,
the defendant, would use the information in the monthly
financial reports from the Property Managers to compile
quarterly investor reports for the TIC Investors that outlined
the current financial status of the TIC Investments (the
"Investor Reports").  The Investor Reports were sent to the TIC
Investors via email.

37.  Based on my discussions with CIP Employee 1 and
the Accountant,[2] I believe that TIMOTHY J. KROLL, the defendant,
intentionally manipulated the numbers in the Investor Reports to
conceal the fact that KROLL and CARLTON P. CABOT, the defendant,

---

[2] The Accountant was compelled to provide information to the
Government under a grant of use immunity by a United States
District Judge.  The information provided by the Accountant has
proven to be reliable and has been corroborated by other
independent evidence in this case, including information
provided by other witnesses, bank records, emails, and corporate
records.

*Information from the Accountant*

f.      The Accountant was not an employee of CIP,
but worked as a consultant preparing tax returns and providing
certain financial accounting services to CIP from in or about
2003 through in or about 2012.  As part of these
responsibilities, the Accountant played a limited role in
reviewing the Investor Reports before they were sent to the TIC
Investors.

g.      The Accountant recalled having discussions
with KROLL in which the Accountant, in substance and in part,
expressed concerns about how KROLL was accounting for the
amounts that CIP owed to the TIC Investment properties in the
Investor Reports.

h.      For example, the Accountant recalled
approaching KROLL after reviewing a draft balance sheet for
Cabot Oak Grove Plaza as of September 30, 2009 that was supposed
to be included in the quarterly Investor Report.  The draft
balance sheet, which the Accountant kept and which I have
reviewed, showed numerous hand-written edits made by KROLL.
Among the edits, KROLL crossed out two line items that reflected
amounts owed by CIP to Cabot Oak Grove Plaza with the notation
"delete."  The Accountant recalled asking KROLL why he had
indicated that these line items should be deleted.  KROLL
responded, in sum and substance, that the balance sheet could
not reflect the amounts owed by CIP to Cabot Oak Grove Plaza.

i.      The Accountant also recalled KROLL making
similar adjustments in the Investor Reports for Cabot Addison.

*Comparison of the Investor Reports to the General Ledgers*

38.     During the course of this investigation, I have
obtained and reviewed approximately twenty Investor Reports
covering nine different TIC Investment properties.  Based on my
review, I have determined that these Investor Reports were false
and misleading and concealed the funds that CARLTON P. CABOT and
TIMOTHY J. KROLL, the defendants, misappropriated from the TIC
Investment properties.  I further believe that these Investor
Reports were manipulated in the same manner that CIP Employee 1
and the Accountant described - namely, KROLL eliminated the line

24

items that reflected amounts owed by CIP to the TIC Investments and altered the amounts of other line items in the balance sheet to account for the difference.  For example:

a.    In or about April 2011, Property Manager 1 provided KROLL with financial statements for the period ending March 31, 2011 for the Cabot 550 Polaris Parkway TIC Investment property.  The balance sheet contained approximately $212,400 in an account titled "Accounts Rec.-Related Party," which represented the funds that CABOT and KROLL had transferred from the property and owed to Cabot 550 Polaris Parkway.

b.    In the Investor Report created by KROLL for the same property, the $212,400 amount did not appear in any of the financial statements, nor was there any indication that CIP owed this money to Cabot 550 Polaris Parkway.  Instead, the $212,400 amount was hidden in the balance sheet by increasing "Account Receivable" by $71,000, increasing "Security Deposit Escrow" by $15,000 and reducing "Accounts Payable-Trade by $126,400, thereby making the balance sheet balance.  The other line items in the Investor Report balance sheet matched the line items in Property Manager 1's general ledger.

c.    Similarly, I have reviewed the financial statements that the Property Manager for Cabot Addison provided to KROLL for the period ending March 31, 2010.  The balance sheet contained approximately $3,304,053 in an account titled "Payable to/from Cabot Investment Properties," which represented monies that CABOT and KROLL had transferred from the property and owed to Cabot Addison.

d.    In the Investor Report created by KROLL for the same property, the $3,304,053 amount did not appear in any of the financial statements, nor was there any indication that CIP owed this money to Cabot Addison.  Instead, the $3,304,053 amount was hidden in the balance sheet by increasing a reserve account called "Lender Tenant Imp/Leasing Escrow" by $2,844,886, by creating another reserve account called "Other Reserve" with an amount of $412,391, and by decreasing "Accrued Expenses" by $46,776, thereby making the balance sheet balance.  The other line items in the Investor Report balance sheet matched the line items in the Cabot Addison general ledger.  This is consistent with the recollections of CIP Employee 1 and the Accountant, both of whom recalled KROLL manipulating the balance sheets for

Cabot Addison.

        e.   The other eighteen Investor Reports that I reviewed and analyzed reflect similar manipulations to hide the funds that CABOT and KROLL transferred out of TIC Investment property accounts.

### *False Statements to TIC Investors*

        39.   During the course of this investigation, I have participated in interviews of several TIC Investors.  Based on these discussions, I have learned, in substance and in part, that TIMOTHY J. KROLL, the defendant, made false and misleading statements to the TIC Investors about how the funds belonging to the TIC Investments were being handled and the overall financial status of the TIC Investments.

        40.   According to the TIC Investors, TIMOTHY J. KROLL, the defendant, held quarterly conference calls to discuss the Investor Reports and the TIC property operations.  The conference calls became less frequent over time and ultimately stopped.  By late 2011 the TIC Investors were not getting their Investor Reports in a timely manner, if at all.  The investor distributions also decreased significantly and became more erratic.

        41.   When the TIC Investors inquired about the decreased distributions, TIMOTHY J. KROLL, the defendant, made false and misleading statements to the TIC Investors that the investor distributions had been reduced because of, among other things, operational issues and capital improvements to the properties.  In truth and in fact, the investor distributions had been reduced, at least in part, because CARLTON P. CABOT, the defendant, and KROLL had been withdrawing funds belonging to the TIC Investments and using them to pay for personal and business expenses, as well as the expenses of unrelated TIC Investments.

        42.   Based on the interview of one TIC Investor ("TIC Investor 1"), I learned, in substance and in part, the following:

        a.   In or about 2011, TIC Investor 1 became concerned about the erratic investor distributions from CIP,

CIP's failure to provide regular Investor Reports, and the lawsuit that CIP was defending related to other TIC Investments. CARLTON P. CABOT and TIMOTHY J. KROLL, the defendants, were not responsive to TIC Investor 1's initial inquiries and, as a result, he contacted the broker-dealer who marketed the TIC Investment to set up a conference call with KROLL.

        b.    On the conference call in or about 2011, KROLL falsely assured TIC Investor 1, in sum and substance, that CIP was financially healthy and would begin issuing investor distributions soon.  KROLL also falsely told TIC Investor 1, in sum and substance, that all of the TIC Investments were separate entities and that the funds belonging to the individual investments were not comingled.

        43.   Based on my discussions with another TIC Investor ("TIC Investor 2") I learned, in substance and in part, the following:

        a.    In or about June 2012, TIC Investor 2 was on a conference call with TIMOTHY J. KROLL, the defendant, and others.  On the call, KROLL admitted that he took $2.3 million out of the Cabot Ashtabula property account, but stated that he removed the money from the account to obtain bargaining power with the mortgage bank to refinance the property.  KROLL also promised that he would repay the funds.  Based on KROLL's representations, TIC Investor 2 understood that the funds had been withdrawn in one lump sum.

        b.    Based on my review of the bank records, I have learned that from in or about November 2010, through in or about November 2011, there were approximately fifty-seven separate wire transfers from the Cabot Ashtabula property account to CIP Operating Account 1 totaling approximately $2,511,572.

        c.    According to TIC Investor 2, the property was never refinanced and these funds were never repaid to Cabot Ashtabula.

### LOSS TO TIC INVESTORS

        44.   Based on my review of an internal CIP balance sheet, dated September 27, 2012, I believe that, as of that

date, CARLTON P. CABOT and TIMOTHY J. KROLL, the defendants, owed approximately $17 million to the TIC Investments, as reflected in the table below:

| PROPERTY | AMOUNT OWED BY CIP |
|----------|-------------------|
| Cabot 20 North Orange | $2,480,394.49 |
| Cabot 465 Cleveland Avenue | $312,137.38 |
| Cabot 570 Polaris Parkway | $403,715.08 |
| Cabot 550 Polaris Parkway | $707,675.83 |
| Cabot Addison | $3,825,731.56 |
| Cabot Ashtabula | $3,092,038.00 |
| Cabot BB&T Financial Center | $225,189.11 |
| Cabot East Broward | $3,001,883.69 |
| Cabot East Town Mall | $439,384.29 |
| Cabot Oak Grove Plaza | $1,484,695.66 |
| Cabot Trafalgar/Avion | $936,635.62 |
| TOTAL | $16,909,480.71 |

        45.    In addition to the approximately $17 million that CARLTON P. CABOT and TIMOTHY J. KROLL, the defendants, misappropriated from the TIC Investments, the TIC Investors also lost approximately $240 million that they invested as principal in the TIC Investments.

        WHEREFORE, the deponent respectfully requests that
arrest warrants be issued for CARLTON P. CABOT and TIMOTHY J.
KROLL, the defendants, and that they be arrested and imprisoned,
or bailed, as the case may be.

                              _____
                              VIRGINIA COLOMBO
                              Postal Inspector
                              U.S. Postal Inspections Service

Sworn to before me this
1st day of June, 2015


_____
THE HONORABLE HENRY B. PITMAN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

29